## IDA E. HULL *vs.* ALFRED G. HULL.

By a contract between *A* and *B*, all the colts thereafter foaled by certain mares sold by *B* to *A* and kept in *B's* stables under *A's* care, were to belong to *A*. Held—

1. That a valid sale could be made of the colts before they were foaled.
2. That the question of retention of possession by *B* could not apply to them, as they were not in existence when the mares were sold to *A* and the contract made.
3. That it was not important, upon a question between *A* and the creditors of *B* as to the title to the colts, whether there had been a legal and visible change of possession as to the mares.

*B* having gone into insolvency the colts were attached as his by one of his creditors, who afterwards delivered them to the trustee in insolvency. *A*, who lived near by and had knowledge of the fact, waited five months before bringing replevin for them, during which time the trustee was at the expense of keeping them. Held not to constitute an equitable estoppel against *A's* claim.

*A*, to rebut evidence that *B* had claimed to own the mares and colts, offered in evidence a stock book kept by him in which he had made entries against the names of the horses that they were the property of *A*. Held to be admissible.

REPLEVIN for six colts; brought to the Court of Common Pleas in New Haven County, and tried before *Cowell, J.,* who found the following facts:—

The plaintiff is the sister of the wife of Rev. William H. H. Murray. The defendant is the trustee of his insolvent estate.

In 1868 or 1869 the plaintiff was employed by Mr. Murray as superintendent, book-keeper and cashier of his stock farm at Guilford in this state, the farm consisting of about three hundred acres with three dwellings and large and commodi-

ous barns and stables. From the commencement of such service down to the institution of insolvency proceedings against him in the summer of 1879, she continued in his employment, residing upon the farm constantly, except occasional visits to Boston and the Adirondacks with Mr. Murray's family. During this period Mr. Murray was a settled minister in Boston, and resided in that city, spending not more than one month in a year upon his farm.

From the commencement of the plaintiff's services until November 12th, 1870, she received no compensation except her board. At that date, being then on a visit to Mr. Murray's family at Boston, he, on account of his indebtedness to her, sold her a brood mare called "Nell," which he then owned and kept in Boston, the mare having never been upon his Guilford farm. At the time of this sale he executed and delivered to her a bill of sale of the mare, and at the same time, to induce her to continue in his employment as superintendent and book-keeper upon his Guilford farm, he agreed with her that she should have the right to keep the mare upon his farm and rear whatever stock she chose to raise from the mare, he paying all expenses of such keeping, and allowing her the free use of his stallions; and that the mare and her progeny should be her compensation for her services as superintendent.

On November 18th, 1870, the mare was sent by Mr. Murray to the Guilford farm with two other horses, a stove and other furniture, belonging to him, all billed as freight to him. All the horses were received at Guilford and placed upon the farm. The plaintiff had meanwhile returned from Boston.

In January, 1872, the plaintiff being again in Boston, the mare "Nell" being unproductive, Mr. Murray, being then further indebted to the plaintiff for her services, sold her another blooded brood mare named "Flying Belle," then owned by him in Boston, and which had never been upon his Guilford farm, under a similar arrangement with that in the sale of the mare "Nell," with the agreement that the plaintiff should thereafter have the two mares, and that whatever stock she could rear from them upon his Guilford farm and at his

expense, should be her compensation for services. He gave her at the same time a bill of sale of the second mare. But this mare was not sent to the Guilford farm until June 12th, 1872, when it was forwarded by Mr. Murray with three other horses and a buggy consigned to him, which were received and put upon the farm as in the former case.

At the time these mares were put upon the Guilford farm the average number of horses kept on the farm by Mr. Murray was three or four, but subsequently a much larger number was kept, and many horses owned by other parties were boarded upon the farm. The mares were worked upon the farm and used by Mr. Murray's family, including the plaintiff, in the same way with the horses belonging to Mr. Murray.

The plaintiff has raised from the mare "Nell" four colts, one of which she sold when four years old. The other three are a part of those described in the replevin writ. The plaintiff has had five colts from the mare "Flying Belle," one of which died, one she sold, and the other three are the remainder of the six described in the replevin writ. All these colts have been kept on the Murray farm or on land leased by Mr. Murray since they were foaled, under the supervision of the plaintiff, and fed and cared for by his grooms in the same manner as the colts and horses owned by Mr. Murray, and the taxes on them and their colts have been paid by Mr. Murray. The amount of the taxes on the horses of the plaintiff was not given in evidence, but the taxes on them and on Mr. Murray's horses were generally all paid by him at the same time.

There was no evidence that at the time of the purchase of these mares by the plaintiff Mr. Murray was indebted to any one.

The plaintiff is an unusually active, capable woman, and at the time of the purchases and agreements Mr. Murray intended to deal liberally with her, believing it was to his benefit for her to reside upon and manage his farm, keeping his house there always in readiness for the reception of his family when they should choose to visit the farm; and to her

·benefit to accumulate property by the rearing of colts pursuant to the agreement. The plaintiff for more than ten years of faithful and valuable services has received no compensation except her board and these two mares and the progeny reared from them.

The mares are now old and of little value, and have been so employed by Mr. Murray's family and upon the labor of the farm under her supervision, as to have more than reimbursed him for all taxes paid by him on her account.

Mr. Murray, about the commencement of 1879, moved from Boston to Guilford, but spent but little time upon the farm, being engaged in business in New Haven. About the middle of June, 1879, he left the state, and has never since exercised any control or supervision over his farm or personal property in this state.

The plaintiff still owns and keeps the mares, and no one else has ever claimed them or either of them since her purchase.

On the first day of August, 1879, the six colts were attached by a creditor of Mr. Murray, with nine other colts belonging to him, they being all together—the mares not being attached, as they were away from the farm. The attaching creditor kept the colts at Guilford for about three months, and then delivered them to the defendant, the trustee in insolvency of· Mr. Murray.

No attempt was made by the plaintiff to maintain her title to the colts by suit until January 12th, 1880, although she was living during the time at Guilford where the colts were. But as soon as she became aware of the attachment of them she forbade the officer taking them and demanded their immediate return to her.

There was no evidence offered as to the financial condition of Mr. Murray other than the facts that the plaintiff's horses were attached as his, and that other horses of his and other of his personal property were attached, and that the defendant was afterwards appointed trustee of his insolvent estate.

The defendant on the trial offered evidence which he claimed tended to prove that the plaintiff was never the

owner of the mares or colts, but that Mr. Murray claimed to own them until about the time of the attachment. To rebut this claim the plaintiff produced the book known as Murray's Stock Book, which had always been kept at the barn office at his farm in Guilford, and offered in evidence three entries therein made by Mr. Murray and one Bixby, his confidential friend, under Mr. Murray's direction in 1873 or 1874, which entries described the mares, and a colt of one of them, and gave the age of each of them, following each of the descriptions with the words—"The property of Miss Ida E. Hull, of Guilford, Connecticut." The defendant objected to these entries being received by the court as evidence for the purposes for which they were offered. But the court overruled the objection and received the evidence.

Upon the foregoing facts the defendant claimed, and asked the court to hold, that the law was so that the plaintiff was not entitled to take the property from the defendant as such trustee; that she never became the bonâ fide owner of the mares and colts; that there was never any such possession on her part as would entitle her to hold the mares or their progeny against the attaching creditors of the vendor or his trustee in insolvency; and that she was guilty of such laches in failing to assert her claim to the property, both before and after the attachment, that she was estopped from now claiming it from the trustee.

But the court overruled all of these claims and rendered judgment for the plaintiff to recover the property claimed.

The defendant filed a motion in error, and also moved for a new trial for error in the admission of evidence.

*W. K. Townsend* and *J. H. Whiting*, in support of the motions.

*H. B. Munson*, contra.

LOOMIS, J. The controversy in this case has reference to the ownership of six colts, the progeny of two brood mares, which the plaintiff, some ten years prior to this suit, purchased in Boston of the Rev. William H. H. Murray. The

contract of sale provided that the plaintiff might take the mares to Murray's farm in this state, of which she was and had been for several years the superintendent, and there keep them as breeding mares; and all the colts thereafter foaled from them, though sired by Murray's stallions, were to be the exclusive property of the plaintiff.

No attempt has been made by Murray's creditors or his trustee to deprive the plaintiff of the mares so purchased, and they are now in her undisturbed possession; but the colts, while on Murray's farm on the 1st of August, 1879, were attached by one of his creditors, who subsequently released the property to the defendant as trustee in insolvency, who had the property in his possession at the time the plaintiff brought her writ of replevin.

The sole ground upon which the defendant claims to hold these colts is, that there was such a retention of possession by Murray after the sale as to render the transaction constructively fraudulent as against creditors.

The court below overruled this claim, and in so doing we think committed no error.

The doctrine as to retention of possession after a sale has no application to the facts of this case. A vendor cannot retain after a sale what does not then exist nor that which is already in the possession of the vendee. This proposition would seem to be self-sustaining. If, however, it needs confirmation, the authorities in this state and elsewhere abundantly supply it. *Lucas* v. *Birdsey,* 41 Conn., 357; *Capron* v. *Porter,* 43 id., 389; *Spring* v. *Chipman,* 6 Verm., 662. In *Bellows* v. *Wells,* 36 Verm., 599, it was held that a lessee might convey to his lessor all the crops which might be grown on the leased land during the term, and no delivery of the crops after they were harvested was necessary even as against attaching creditors, and that the doctrine as to retention of possession after the sale did not apply to property which at the time of the sale was not subject to attachment and had no real existence as property at all.

The case at bar is within the principle of the above authorities, for it is very clear that the title to the property

in question when it first came into existence was in the plaintiff.

In reaching this conclusion it is not necessary to hold that the mares became the absolute property of the plaintiff under Massachusetts law without a more substantial and visible change of possession, or that under our law, the title to the mares being in the plaintiff clearly as between the parties, the rule imported from the civil law, *partus sequitur ventrem,* applies.

We waive the consideration of these questions. It will suffice that, by the express terms of the contract, the plaintiff was to have as her own all the colts that might be born from these mares. That the law will sanction such a contract is very clear.

It is true, as remarked in Perkins on Conveyances (tit. *Grant,* § 65,) that "it is a common learning in the law that a man cannot grant or charge that which he has not;" yet it is equally well settled that a future possibility arising out of, or dependent upon, some present right, property or interest, may be the subject of a valid present sale.

The distinction is illustrated in Hobart, 132, as follows:— "The grant of all the tithe wool of a certain year is good in its creation, though it may happen that there be no tithe wool in that year; but the grant of the wool which shall grow upon such sheep as the grantor may afterwards purchase, is void."

It is well settled that a valid sale may be made of the wine a vineyard is expected to produce, the grain that a field is expected to grow, the milk that a cow may yield, or the future young born of an animal. 1 Parsons on Contracts, (5th ed.,) page 523, note *k,* and cases there cited; Hilliard on Sales, § 18; Story on Sales, § 186. In *Fonville* v. *Casey,* 1 Murphy (N. C.), 389, it was held that an agreement for a valuable consideration to deliver to the plaintiff the first female colt which a certain mare owned by the defendant might produce, vests a property in the colt in the plaintiff, upon the principle that there may be a valid sale where the title is not actually in the grantor, if it is in him potentially,

as being a thing accessory to something which he actually has. And in *McCarty* v. *Blevins*, 5 Yerg., 195, it was held that where *A* agrees with *B* that the foal of *A's* mare shall belong to *C*, a good title vests in the latter when parturition from the mother takes place, though *A* immediately after the colt was born sold and delivered it to *D*.

Before resting the discussion as to the plaintiff's title we ought perhaps briefly to allude to a claim made by the defendant, both in the court below and in this court, to the effect that if the plaintiff's title be conceded she is estopped from asserting her claim. This doctrine of estoppel, as all triers must have observed, is often strangely misapplied. And it is surely so in this instance. The case fails to show any act or omission on the part of the plaintiff inconsistent with the claims she now makes, or that the creditors of Murray or the defendant as representing them were ever misled to their injury by any act or negligence on her part. On the contrary the estoppel is asserted in the face of the explicit finding, that " as soon as the plaintiff became aware of the attachment of her horses she forbade the officer taking the same, and demanded their immediate return to her."

The only fact which is suggested as furnishing the basis for the alleged estoppel is, that from the first of August, 1879, to the 12th of January next following, "no attempt was made by the plaintiff to maintain her title by suit, although she was living during the time at Guilford where said colts were." But who ever heard of an estoppel in an action at law predicated solely on neglect to bring a suit for the period of five months? To recognize such a thing for any period short of the statute of limitations would practically modify the statute and create a new limitation. Furthermore, in what respect have the defendant and those he represents been misled to their injury by this fact? The plaintiff never induced the taking or withholding of her property. And can a tort-feasor or the wrongful possessor of another's property object to the delay in suing him for his wrong, and claim, as in this case, an estoppel on the ground that his own wrongful possession proved a very expensive

one to him, amounting even to more than the value of the property? He might have stopped the expense at any time by simply giving to the plaintiff what belonged to her.

The single question of evidence which the record presents we do not deem it necessary particularly to discuss. It will suffice to remark that if the defendant's testimony was admissible to show that Murray, after the sale to the plaintiff, (and so far as appears in her absence,) claimed to own the mares and colts, it was a complete and satisfactory reply for the plaintiff in rebuttal to show that Murray's own entries, (presumably a part of the *res gestæ*,) in the appropriate books kept by him, showed the fact to be otherwise, and in accordance with the plaintiff's claims.

At any rate it is very clear that no injustice was done by this ruling to furnish any ground for a new trial.

There was no error in the judgment complained of and a new trial is not advised.

In this opinion the other judges concurred.